Filed 2/11/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re L.G., a Person Coming Under the Juvenile Court Law.<br><br>_____<br><br>PEOPLE OF THE STATE OF CALIFORNIA,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>L.G.,<br><br>        Defendant and Appellant. | B331298<br><br>Los Angeles County<br>Super. Ct. No. LB0086A |

APPEAL from a judgment of the Superior Court of Los Angeles County, John C. Lawson, II, Judge.  Reversed and remanded with instructions.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

_____

We suppress evidence from an illegal search.

Officer Victor Quezada was driving his partner Officer Diego Millan in a marked cruiser. As uniformed members of a gang detail, Quezada and Millan were patrolling Harbor City Crips gang territory after dark. Millan had arrested an unrelated person for a gun crime in this area about a month earlier.

Millan saw three young men standing on a sidewalk and recognized one—Nathan Cazares—as a Harbor City Crips member. Quezada drove to the three, turning the cruiser so he was close to them. Parked cars separated the cruiser from the group. The officers stayed in their car.

With the window down, Quezada tried to engage the three in conversation: where did they live, what were they doing there, and so forth. Two responded but L.G. did not. L.G. was 15 years old.

About twenty seconds into Quezada's questioning of the group, Millan shined his flashlight on them.

Quezada directed questions at L.G. specifically. L.G. did not respond.

L.G. did not look at the officers. Rather, he looked sideways and at the ground. This lack of eye contact "piqued" Millan's interest.

The whole interaction lasted "a little over a minute."

Quezada thought L.G. looked "nervous." Quezada pulled forward a little and shifted from drive to park.

Based on L.G.'s demeanor, Millan suspected L.G. was carrying illegal drugs or a gun. Quezada had the same reaction. The two officers decided to get out of the car to "conduct a narcotic or firearm investigation." They were "trying to see if any

2

of the males were possibly possessing a weapon or drugs or anything else illegal."

Millan and Quezada turned on their body cameras at this point, because "[n]ow we went from consensual, talking to people normally, to now we're going to do an enforcement." Quezada told Millan "we're going to step out of the vehicle to do a pedestrian stop."

Both Millan and Quezada got out of the car.

A transcript in evidence at the suppression hearing showed Quezada told the youths "Step out to the street! Get your hands up!" No evidence conflicted with this transcript.

Millan headed around the back of the cruiser. When he got to the trunk, L.G. took off at a run, clutching his waistband as if he were holding a gun.

Millan and Quezada called for backup, which arrived and caught L.G., whom they found carrying a gun. Officers arrested L.G. Charged with a gun crime, L.G. challenged the search, which on uncontested facts the trial court ruled was proper. The trial court did not address Quezada's transcribed statements, "Step out to the street! Get your hands up!"

The key distinction is between a consensual encounter and a detention. Consensual encounters require no justification. Detentions—also called *Terry* stops or stop-and-frisks—do. If an officer's show of authority restrains someone's liberty in some way, then the officer has seized that person and must justify this detention. Police seize someone if, in view of the situation, reasonable people would not believe they are free to leave. We consider the totality of the circumstances to determine whether police actions turn an encounter into a detention. Officers' mental states become relevant only if overt actions reveal them.

When there is no factual conflict, our review is independent. (*People v. Flores* (2024) 15 Cal.5th 1032, 1041–1043 (*Flores*); *People v. Jackson* (2024) 100 Cal.App.5th 730, 736–737.)

This search was improper. (See *Flores, supra,* 15 Cal.5th at pp. 1041–1051.) There was too little evidence of criminal activity. Officers saw L.G. with a known gang member in gang territory where there had been an unrelated arrest in the past. Based on that and L.G.'s nervous demeanor, the officers decided to go beyond a consensual encounter.

Nervousness was not enough. Police properly can note this factor. (*Flores, supra,* 15 Cal.5th at p. 1044.) But innocent people can get nervous and go silent when police appear out of the dark, aim a flashlight, and start asking questions. The questions were pointed: Quezada agreed he was not asking them "what's a good place to eat" around here? Millan said, in his experience, "many individuals don't want to talk to police."

Being nervous and deliberately avoiding police interaction did not reasonably suggest criminal activity was afoot. (*Flores, supra,* 15 Cal.5th at pp. 1043–1049.) L.G.'s "disinclination to engage with the officers does not carry the same salience as headlong flight in the totality of the circumstances analysis." (*Id.* at p. 1047.)

The fact of an unrelated arrest a month before is pertinent but insufficient. (*Flores, supra,* 15 Cal.5th at pp. 1043, 1049.)

Cazares's gang status was relevant but was not a license to frisk his companions anytime and anywhere.

Nervousness, an unrelated arrest, and a gang companion did not create reasonable suspicion L.G. was at that moment committing a crime.

4

Once the police said, "Step out to the street!  Get your hands up!" and advanced in a coordinated and simultaneous approach, reasonable people in L.G.'s situation would not believe they were free to leave.  The objective observer would conclude officers were getting out of the car for a reason beyond casual conversation.  If conversation was their goal, they already had achieved it:  Quezada was conversing freely with the young men.  L.G. was not talking, as was his right.

When police gave the hands-up instruction, instantly the situation became grave.  Now a reasonable person would, at all costs, avoid furtive movements that could trigger a deadly response from law enforcement.

A reasonable person would conclude officers were moving from talk to action, which indeed was what Quezada and Millan had decided.  Their action, objectively evaluated, signified they were moving beyond consent and imposing their will on the unwilling.  Their objective actions manifested their subjective intention:  to restrain L.G.  The words with the exclamation marks were commands.  Coercion had replaced conversation.

In this situation, the coordinated advance constituted a show of force that transformed a consensual encounter into an invasion of liberty.

The officers lacked a particularized and objective basis for believing L.G. was breaking the law.  Later events do not alter this analysis.  (See *Flores, supra*, 15 Cal.5th at pp. 1041–1051 [later discovery of gun did not rescue initial illegal search]; *Badillo v. Superior Court* (1956) 46 Cal.2d 269, 273 [defendant's flight was the direct result of the officer's illegal entry and evidence obtained thereafter was in violation of constitutional guarantees].)

5

## DISPOSITION

We reverse the judgment, vacate the adjudication, and remand the matter.  On remand, the trial court shall vacate its order denying L.G.'s motion to suppress the evidence and shall enter a new order granting that motion.


WILEY, J.

We concur:


STRATTON, P. J.


GRIMES, J.